## THE KING vs. ROBERT GRIEVE.

OBSCENE PUBLICATION. BEFORE McCULLY, J., IN INTERMEDIARY
COURT.

APRIL, 1883.

An obscene programme of Hula Dances, in the Hawaiian language, was printed in a newspaper office of which defendant was manager: Defendant was not acquainted with the language, did not know the nature of the matter, and considered it official because it had the imprint of the Royal Arms, and was handed to him by an officer of the Government.

Held, defendant's knowledge and intention were of the essence of the crime: and as he was not put on enquiry as to the contents of the paper, but was entirely ignorant thereof, he cannot be held criminally responsible.

BRIEF OF A. S. HARTWELL FOR DEFENDANT.

The facts shown by the prosecution do not constitute or show a criminal offense.

It is the uncontradicted evidence that this defendant is, and at the time of the printing of the pamphlet was, utterly ignorant of its meaning and of the language in which it is uttered; also, that the printing was done by the native foreman of the printing establishment of which the defendant is part owner, under circumstances which properly led the defendant to infer that high officers of the Government desired the printing for use on a public occasion. The evidence further shows that the pamphlet was used and circulated on that occasion with the Royal Arms impressed upon it.

The statute defines a "common nuisance" as the "endangering of the public personal safety or health by doing, causing or promoting, maintaining or continuing what is offensive or annoying and vexatious, or plainly hurtful to the public, or is a public outrage against common decency or common morality, or tends plainly and directly to the corruption of the morals, honesty and good habits of the people, the same being without

authority or justification by law." Penal Code, Chap. XXXVI., Section 1.

The statute enacts the Common Law, that "a party accused shall be presumed to be innocent;" also, that "everyone shall be presumed to mean the natural and plainly probable consequence of his acts." Penal Code, Chap. II., Sections 6 and 7.

The offense of committing a common nuisance by "printing an obscene pamphlet * * * manifestly tending to the corruption of the morals of youth or of morals generally" (which is the language of the statute), is not committed by one in utter ignorance of even its possible meaning, who could not ascertain its meaning of his own knowledge, and had, on the contrary, the best of reasons not to suppose that there was the slightest impropriety.

There are Common Law offenses in this Kingdom, these being defined by statute as "doing what a penal law forbids to be done, or omitting to do what it commands." Penal Code, Chap. I., Section 1.

If an act is an offense at Common Law, irrespective of statutory ingredients of the offense charged, a criminal charge in Courts governed by the Common Law may be good, if it fail to show a statutory offense. In this country, however, it is material to show a statutory offense.

"In statutory offenses there must be an evil intent, though the statute is silent on the subject." 1 Bishop Crim. Law, Sec. 345; *Watson vs. Hall,* 46 Conn., 204.

The case of *U. S. vs. Kirby,* 7 Wallace, 482, was one of a prosecution for obstructing the carriage of the mails, by arresting the carrier upon a warrant from a State Court. The United States Supreme Court held it not such an obstruction as was contemplated by the statute, and said, Field, J.: "All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always, therefore, be presumed that the Legislature intended exceptions to its language, which would avoid results of this character. The

reason of the law should in such cases prevail over its letter." See 5 Barb., 203.

A licensed tavern-keeper is not criminally responsible for his bar-keeper selling liquor at his bar on Sunday without proof of an intent on his part to violate the statute. *People vs. Utter,* 44 Barb., 170.

An indictment for nuisance on premises is not sustained by proof merely that the defendant is the owner of them. *People vs. Townsend,* 3 Hill, 479.

In an indictment for selling an obscene book, a *scienter* is necessary. Wharton's Crim. Law, Sec., 297, citing 1 Bennett & Heard's Leading Cases, and several cases adjudicated.

A blind man, who cannot see, and has no reason to suspect that he is selling an obscene picture, cannot be held guilty of a criminal offense in so doing.

The law of intent is stated in Bishop on Criminal Law, Sections 301 *et seq:* "In the law of crime, the maxim is *ignorantia facti excusat,* * * * Ignorance or mistake of facts is, in all cases of supposed offense, a sufficient excuse."

*Ib.* Section 302: "Since an evil intent is an indispensable element in every crime, any such mistake of facts as, happening to one honestly endeavoring to discharge all legal and social duties, shows the complained of act to have proceeded from no sort of evil in the mind, takes from it its indictable quality. A briefer expression of the same thing is, that a mistake of fact, neither induced nor accompanied by any fault or omission of duty, excuses the otherwise criminal act which it prompts."

"What is absolute truth no man ordinarily knows. All act from what appears, not from what is. If persons were to delay their steps until made sure, beyond every possibility of mistake, that they were right, earthly affairs would cease to move, and stagnation, death, and universal decay would follow. All, therefore, must, and constantly do, perform whatelse they would not through mistake of facts. If their minds are pure, if they carefully inquire after the truth, but are misled, no just law will punish them, however criminal their acts would have been if

prompted by any evil motive, and executed with the real facts in mind."

"In the law, therefore, the wrongful intent being the essence of every crime, it necessarily follows that when one is misled, without fault or carelessness, concerning facts, and while so misled, acts as he would be justified in doing were they what he believed them to be; he is legally innocent, the same as he is innocent morally." *Ib.*

The doctrine is, that one may be criminally responsible where the act itself necessarily implies either a direct evil intent, or that kind of indifference, recklessness or carelessness to which the law attaches the same consequences as if an actually evil intent existed. The Penal Code defines malice as not only "doing a wrong or injury to any person or persons, or to the public," but also as "acting with a heedless, reckless disregard, or gross negligence of the life or lives, the health or personal safety, or legal rights or privileges of another or others;" also, "the willful violation of a legal duty or obligation, and willful contravention of law." Penal Code, Chap. I., Sec. 3.

In *Rex vs. Hicklin,* 3 Q. B., 360 (1868), a leading case on the subject of innocent motive for publishing an obscene pamphlet, it is held that such motive is no defense; but, if there is no knowledge, there can be no motive, good or bad, there is no *"mens rea."*

In *R. vs. Wiatt,* 8 Mod., 129, defendant was released from a criminal charge of libel on the Court of King's Bench, being the selling of a book in the Latin language, on his affidavit that he did not understand the language.

So it was held that defendants are not criminally liable in the following cases, viz.: "1. Where a postman carries a sealed letter—per Lord Kenyon in *R. vs. Topham,* 4 Term, 129. 2. Or a parcel in which libelling hand-bills were wrapped up—*Day vs. Brean,* 2 M. & R., 55. 3. Or where the defendant could not read."

Per Lord Kenyon, C.J., in *R. vs. Holt,* 5 Term, 444: "And even if the defendant read the libel, still if the words are on the

face of them innocent, and only became defamatory when their meaning was pointed out by certain extrinsic facts and circumstances wholly unknown to the defendant, then he. would still be unconscious that what he published was a libel, and such a publication would be deemed innocent; or where the libel was contained in an allegory or riddle, to which the defendant had no clue. Again, where the defendant copied a libel knowing it to be a libel, and afterwards inadvertently delivered such copy to a third person in mistake for some other paper, it is submitted that he would not be held criminally liable for such an accident, though he would be held liable in a civil case."

Citing *R. vs. Hervey*, 4 B. C., 257, Odgers on Libel and Slander, page 384.

If it comes, then, as I think it does, to a question whether this defendant is shown by the evidence to have acted with a heedless, reckless disregard, or gross negligence, I submit that he should be acquitted on the evidence, as well as on the law. So far from being shown to have acted in that manner, he is not shown to have acted at all, but merely not to have prevented his native foreman from printing a document purporting to emanate from an official source.

## DECISION OF McCULLY, J.

The defendant, who is the manager and part owner of the *Hawaiian Gazette* Printing Office, is charged with the offense of Common Nuisance in printing an obscene paper, to wit, the programme of the Hulas or Hawaiian Dances to be performed as part of the coronation festivities. It is agreed that the record of the Police Court be taken, and it is admitted to be proved that the defendant is not acquainted with the Hawaiian language (in which the paper was written) ; that he did not know the nature of the matter printed; that it was brought to his office by an officer of the Government; and that he considered it was official matter, the person bringing it causing it to have. the imprint of the Royal Arms. In fact, it was left to the Hawaiian foreman of the office, who takes sole charge of the

printing in the Hawaiian language, and Mr. Grieve had personally nothing to do with it.

It is not denied that the real import of the language and figures of speech of the paper which was printed is obscene.

The case is submitted to the Court solely on the point of law, whether the defendant is criminally liable in common nuisance for the printing of a document which contained obscene matter, which was in a language of which he was ignorant, nothing putting him upon inquiry, and the copy coming from an official or public source, and intended to be used, and in fact afterward used, by officers of the King as the programme of public festivities.

The strongest statements of authority to support the prosecution are such as are to be found in 1 Russell on Crimes, pp. 250, 251, citing Lord Hardwicke in 2 Atkyns, 472: "Though printing papers and pamphlets is a trade by which persons get their livelihood, yet they must take care to use it with prudence and caution; for if they print anything that is libellous it is no excuse to say that the printer had no knowledge of the contents, and was entirely ignorant of its being libellous." 1 Hawk., P. C. C. 73: "But if a printer is confined in a prison to which his servants have no access, and they publish a libel without his privity, the publication of it shall not be imputed to him." "Upon such foundation," says the text of Russell, "it has for a long time been held that the buying of a book or paper containing libellous matter, in a bookseller's shop, is sufficient evidence to charge the master with the publication, although it does not appear that he knew of any such book being there, or what the contents thereof were, and though he was not on the premises, and had been kept away for a long time by illness; and it will not be presumed that it was bought and sold by a stranger; but the master must, if he suggests anything of this kind in his excuse, prove it." Also from the text of Russell: "But there may be cases in which the presumption arising from the proprietorship of a paper may be rebutted."

From the above citations the rule might be derived that in

such a case as this at bar, the proprietor or manager of a printing press will be chargeable for an obscene document printed in his establishment, the legal presumption being that he knows the character of the work done by his servants, and that his ignorance through mere inattention or absence will not relieve him from a responsibility which lies on him, but that this legal presumption may be rebutted by actual proofs. I think that what is here taken as proved rebuts the legal presumption in his case. Mr. Grieve had absolutely no knowledge that the manuscript brought to his office contained obscene matter, and no circumstance called upon him to cause a scrutiny to be made of its contents. Quite the contrary. To hold that a person innocent in fact, and not chargeable with blame for being ignorant, is criminally responsible would be a harsh construction of the law.

A fundamental principle of criminal law is expressed in the maxim: *Actus non facit reum nisi mens sit rea, i.e.,* the act itself does not make a man guilty unless his intentions were so.

A case very much in point is found in 1 B. and H. Lead. Crim. Cases, pp. 551-2. The indictment under the Mass. statute, similar to our own, charged the defendant with selling a book containing obscene language, but did not allege the defendant's knowledge. Abbott, J., sustained a demurrer on this ground, holding that knowledge was a necessary ingredient, and saying that the argument urged for the prosecution that it was intended to make the sale of such books punishable whether their contents were known or not, should not obtain, saying that "generally, intent, knowledge, is of the very essence of crime, and there must be very strong reasons shown to take any case out of the application of this general rule."

Upon such considerations, I find the defendant Not Guilty.

W. R. Castle, for Crown.

A. S. Hartwell, for defendant.

Honolulu, April 4, 1883.